## Commonwealth v. Vonderheid

*Howard R. Berninger*, District Attorney, for Commonwealth.

*Robert E. Bull*, for defendant.

KREISHER, P. J., February 19, 1962.—This case comes before the court by way of an appeal from a summary conviction before a justice of the peace for a violation of the Penal Code of June 24, 1939, P. L. 872, sec. 942, 18 PS §4942, which provides, inter alia, as follows:

"Whoever wantonly or cruelly illtreats, overloads, beats or otherwise abuses any animal, whether belonging to himself or otherwise, or abandons any maimed, sick, infirm or disabled animal, or keeps or uses, or in any way is connected with, or interested in the management of, or receives money for the admission of any person to any place kept or used for the purpose of fighting or baiting any bull, bear, dog, cock or other creature, or encourages, aids or assists therein, or permits or suffers any place to be so kept or used, shall, upon conviction thereof in a summary proceeding, be sentenced for the first offense to pay a fine of not more than twenty dollars (20) . . ."

This section of the Penal Code was derived from and is a consolidation of at least seven previous acts of assembly, dating from the first act in 1830 to the last act in 1891. Some of the previous acts had declared cruelty to animals to be a misdemeanor; however, these acts have been repealed, and the above quoted act makes it a summary conviction.

As a general rule, the prior acts were applied only in the case of domestic animals. However, it is our opinion that the present act is in such general terms that "any animal" used therein, might be considered to include wild, as well as domestic, animals.

Defendant is the owner, proprietor, and operator of Von's Circus and a roadside menagerie called the Red Rock Game Farm. For these two operations, defendant has purchased over the years no less than 44 pieces of wild and domestic game including ponies, donkeys, lions, a tiger, a hippopotamus, a water buffalo, two llama-type animals, two dwarf cattle, one or two chimpanzees, and various other beasts. He uses some of these animals during the summer in his circus acts which travel around the country. However, the majority of the animals are on exhibit at the said game farm.

In the fall of 1961, defendant was able to lease a large building on the outskirts of Benton Borough which was previously used for a livestock auction. At the approach of cold weather, after disbanding the circus and closing the game farm, he moved these animals into said building.

The ponies were permitted to leave the building, and pasture in an adjoining field. The hippopotamus was placed in a large cage with a concrete floor near a water connection so that the same could be hosed down four or five times a day. The members of the cat family were housed in circus cages, as were the members of the monkey family. The two dwarf cattle were tied

at an entry way, and the water buffalo was snubbed to a post. The building was heated by one large hot air coal furnace, and one large kerosene-burning, smudge pot-type of heater.

On November 16, 1961, the premises was inspected by a member of the Pennsylvania Society for the Prevention of Cruelty to Animals with headquarters in Philadelphia. It was learned on this tour of inspection that defendant was recuperating from an operation at the Bloomsburg Hospital, and that the animals were in the charge of an employe. After making an inspection, the officer left the premises, and on November 22, returned in company with Frederick A. Ulmer, Jr., who is the curator of mammals at the Philadelphia Zoo.

On this date, it was raining quite hard, and during the period of inspection, the officers found that the building was cold and damp, that the ponies were in out of the pasture crowded in their stall, that some of the rain water was seeping into the building, that in their opinion the monkeys and the members of the cat family were in cages too small for them, that the water buffalo was snubbed to a post so that he could not move freely, nor lower his head to be allowed to lie down. They also found considerable mud and manure on the floor with insufficient bedding, and that, in their opinion, there was insufficient food. Therefore, as a result of this inspection, they lodged an information charging defendant with the violation of the above quoted act of assembly.

On appeal, a hearing de novo was held on January 29, the testimony has now been transcribed and filed, and the matter is now before us for disposition.

Defendant testified that he secured most of his animals from the American Museum who regularly inspect his housing of the animals, and would not sell him animals unless he kept them satisfactorily. He

says that he considers himself and the animals fortunate in securing this building for their winter quarters, and that he has been in the business of quartering and working with animals of this nature since boyhood. He described where he secured their food, and the type of food he fed the animals, and stated that the mortality rate of his animals was very low.

He also testified that he paid $1,000 each for the two dwarf cattle, and that after untying them in accordance with the inspector's demands, the cattle gorged themselves by reason of their physical defects, and both of them died since they eat continuously if they are permitted to roam about. Therefore, he contends it was more cruel to permit these cattle their freedom than to keep them tied up and control their diet.

He also testified that he has disposed of the water buffalo since he was unable to properly house the same, and that, in his opinion, the animals were being properly cared for and that he was not guilty of the alleged offense.

To corroborate this testimony, he called his caretaker and a veterinarian who practices in the immediate vicinity and tends the animals. The doctor stated that in his opinion the animals were not being treated cruelly, that they had sufficient room to move about, and that there was plenty of bedding and food on hand at all times.

Because of the importance of this case, and the wide divergence of the respective contentions, the court made a personal visit to these winter quarters without any previous notice to defendant or any of his employes, and upon personal inspection, we found plenty of hay and bedding on hand, and that the pens were clean except for the natural stench of urine and manure which even exists in a dairy barn, or for that matter in the Philadelphia Zoo.

The fires were burning, and even though it was a very cold day outside, the building inside was warm and comfortable. The animals seemed to be in good condition, and we were personally impressed with the manner in which they were being cared for.

Now, looking at the law on the subject, we first note in passing that in order to maintain the type of business run by defendant, it is necessary under the Pennsylvania Game Laws for defendant to be issued a special permit for his business.

The Game Law of May 11, 1949, P. L. 1118, sec. 1, as amended, 34 PS §1311.417, provides that the Pennsylvania Game Commission may grant permits for roadside menageries which are defined as any place where one or more wild animals are kept in captivity, and that the commission is given the authority to supervise and police these enterprises, and upon finding them improperly kept, to revoke the permit.

Defendant in this case is the holder of such a permit, and even though the Game Commission has made periodic inspections, they have not seen fit to revoke defendant's permit, and therefore, he must be maintaining their standards.

Secondly, an examination of the above quoted act in the first sentence prefaces the illegal act by stating, "whoever wantonly or cruelly ill-treats, etc." These words have been construed by other courts, and we think the language of Judge Dannehower, recently retired, in the case of Commonwealth v. Harris, 36 D. & C. 122, clearly and explicitly sets forth the elements of the act in the following language:

"Cruelty to animals may consist of active cruelty, which is wilful or wanton abuse or ill-treatment or unnecessary or unreasonable acts or conduct which cause pain and suffering, or in passive cruelty, which may consist of acts of omission, neglect, and the like, whereby the same kind of suffering is caused or per-

mitted. Where, however, it is expressly or impliedly required that the prohibited act should have been done wilfully or wantonly or with the intent to ill-use the animal or subject it to unncessary pain and suffering, it must appear that the act was intentional, as distinguished from accidental or involuntary, or that the accused was actuated by malevolent purpose or reckless disregard of the consequences.

"To justify a conviction, therefore, there must be present a malevolent purpose or a spirit of wickedness or cruel wantonness or a reckless disregard of the rights and feelings of the brute creature."

The record before us discloses that defendant was laid up in the hospital on the date of the alleged offense, that the weather conditions by reason of the torrential rain were unusual, and that the animals were not being cruelly treated actively, but rather, the overall picture did not come up to the standards which the curator of the Philadelphia Zoo felt should exist because it appeared to him there was some overcrowding and the lack of constant attention.

Our personal visit has dispelled any feeling of sorrow for these animals except that which is naturally present within a human being on seeing any wild animal in a cage whether it be in a circus, on television, or in a roadside menagerie.

Defendant is endeavoring to make his livelihood from the use of these animals. He has expended large sums of money to secure them, and he most certainly is not about to impair his investment by improper food or shelter. Even though some of the southern planters before the Civil War may have cruelly treated some slaves, on the other hand, the slave that produced was well fed and housed by reason of their livelihood to the planter.

We find from our examination of the testimony, and from our personal visit, a complete lack of any wilful

neglect, cruel wantonness, or wickedness on the part of defendant which we believe is required to sustain a prosecution under this section of the Penal Code, and therefore, this element of malevolent or wanton ill treatment being lacking, we conclude that the Commonwealth has not made out its case beyond a reasonable doubt, and that defendant is entitled to an acquittal.

The remaining note in passing is that the businessmen of the immediate communities are concerned for the retention of this enterprise because it has in the past attracted many persons to the vicinity, and it is their opinion that their business would suffer a considerable blow in the summertime if this attraction was not permitted to remain in their vicinity, and therefore, we think the determination of whether or not this enterprise should be permitted to continue or be put out of business is a matter that rests with the Pennsylvania Game Commission under the Pennsylvania Game Laws above referred to, and is not a matter for our criminal courts. To this end, we make the following:

*Order*

And now, to wit, February 19, 1962, the appeal is sustained; defendant is found not guilty, and the costs are placed upon the County of Columbia.